Richard L. **SANDSTROM**, etc.,
Plaintiff, Appellant,

v.

**CHEMLAWN CORPORATION**, et al.,
Defendants, Appellees.

No. 89–2196.

United States Court of Appeals,
First Circuit.

Heard April 2, 1990.
Decided May 17, 1990.

Before TORRUELLA and SELYA, Circuit Judges, and COFFIN, Senior Circuit Judge.

SELYA, Circuit Judge.

Having learned to his dismay that the grass is not always greener in some more convenient venue, plaintiff-appellant Richard L. Sandstrom asks that we rescue him from an inhospitable legal landscape. After carefully reviewing the record and the arguments advanced, we find the forestation to have been planted largely by Sandstrom's own hand. We therefore decline to disturb the district court's order of dismissal.

## I. ROOTS OF THE DISPUTE

The seeds of this controversy were sown some time ago in Connecticut (where the Sandstrom family was living). Plaintiff's son and ward, Richard C. Sandstrom, a legal incompetent, allegedly sustained injuries there through exposure to pesticides used by the defendant.[1] The problem with ChemLawn pesticides was apparently widespread; in 1986, a class action (the *Blake* suit) was brought against ChemLawn in the United States District Court for the Eastern District of Pennsylvania. Sandstrom would have been part of the *Blake* class. But the district court refused class certification.

Undaunted, Sandstrom continued to plough the same field. Along with 23 other plaintiffs, he filed a civil action (the *Bugman* suit) against the same defendant in the same court on February 10, 1988. Jurisdiction was premised on diversity of citizenship and the existence of the requisite amounts in controversy. *See* 28 U.S.C. § 1332(a) (1982). ChemLawn moved to sever the 23 individual claims. With respect to those plaintiffs who did not reside in the district, ChemLawn also sought to change venue pursuant to 28 U.S.C. § 1404(a).[2] In

Jeffrey S. Goldstein, with whom Bertram M. Goldstein, Goldstein, Hood & Associates, Baltimore, Md., Ronald R. Coles, and Coles & Monque, Kennebunk, Me., were on brief, for plaintiff, appellant.

Christopher C. Taintor, with whom Robert F. Hanson, Norman, Hanson & DeTroy, Portland, Me., Michael K. Yarbrough, and Frost & Jacobs, Columbus, Ohio, were on brief, for defendants, appellees.

1. There are actually two defendants, ChemLawn Corp. and ChemLawn Services Corp. (appellees before us). They are commonly owned and operated. For ease in reference, we refer to them jointly as "ChemLawn" and treat the matter as if there were only one defendant involved.

2. The statute provides:

*haec verba*, the motion specifically requested that such claims be transferred "to the Federal Judicial District[s] in which the respective plaintiffs reside and/or their causes of action arose." In an accompanying memorandum, ChemLawn stated that jurisdiction over it was "available in each of the judicial districts represented by the named plaintiffs."

By the time this motion was served, Sandstrom—unlike most of his fellow *Bugman* plaintiffs—no longer dwelt in the district where the exposure had occurred, having moved from Connecticut to Maine. Sandstrom did not oppose defendant's motion to transfer and, apparently preferring Maine to Connecticut or Pennsylvania as a locus for further prosecution of his claim, acquiesced in defendant's suggestion that the case be sent to Maine. On June 28, 1988, the district court granted the motion, severed Sandstrom's claim, and transferred the remnant to the United States District Court for the District of Maine.

A year went by. The parties cultivated and completed pretrial discovery. The court scheduled trial to begin on July 17, 1989. Plaintiff sought a continuance, but the judge would not oblige. Plaintiff then took a different tack: to rid himself of the unwanted trial assignment, he stipulated to a voluntary dismissal, without prejudice.[3] The case was dismissed on June 14, 1989.

Far from abandoning hope of harvesting the fruits of his litigation, Sandstrom planned merely to postpone the yield. Within a matter of weeks, he brought the instant diversity action in the Maine federal court. The "new" case (*"Sandstrom II"*) was materially indistinguishable from the "old" case (*"Sandstrom I"*) which had been carved out of *Bugman*. Following service of process, ChemLawn moved to dismiss *Sandstrom II* for want of *in personam* jurisdiction. The district court granted the motion. *Sandstrom v. ChemLawn*, 727 F.Supp. 676 (D.Me.1989).

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. 28 U.S.C. § 1404(a) (1982).

## II. EFFECT OF PRIOR PROCEEDINGS

On appeal, plaintiff's primary contention is that in the course of *Sandstrom I* ChemLawn "represented" that Maine enjoyed jurisdiction over ChemLawn's corporate person and that ChemLawn should be bound by this representation in *Sandstrom II*, thereby forestalling its assertion of a jurisdictional defense. Having scrutinized the record, we find neither plaintiff's premise nor his conclusion to be tenable.

### A.

■ The record is clear that ChemLawn never explicitly represented that it transacted business in Maine or was subject to service of process there. Similarly, there has been no persuasive showing that ChemLawn impliedly made such a representation. Although appellee's 1988 statement that jurisdiction was "available" in the district "represented" by the plaintiff (quoted *supra* p. 85) seems ambiguous on its face, the ambiguity vanishes once the statement has been placed in context. Court filings, like other documents, must be read as a whole. Reading ChemLawn's memorandum to the Pennsylvania district court in its entirety, ChemLawn asserted only that, as to each of the plaintiffs (Sandstrom included), personal jurisdiction existed in either the district where the exposure occurred *or* a district where the plaintiff resided. Since the parties agree that personal jurisdiction was available in Connecticut at all times material hereto, there was no misrepresentation. Infelicity of phrase notwithstanding, we are unable to accept as plausible any more sinister interpretation of the disputed language.

This is so despite an ingenious smoke-and-mirrors argument which plaintiff belatedly constructs around *Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254

**3.** The dismissal was effected under Fed.R.Civ.P. 41(a)(1), which provides in pertinent part:
[A]n action may be dismissed by the plaintiff without order of court ... (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action.

(1960). Certainly, *Hoffman* suggests that, from the perspective of venue, *Sandstrom I* should not have been dispatched to a district where the defendant was unamenable to process. *See id.* at 343–44, 80 S.Ct. at 1089–90. Inasmuch as *Hoffman* was never mentioned at the time of transfer, the most logical inference to be drawn, however, is that all of the protagonists— plaintiff, defendant, and the transferor court—overlooked it. Furthermore, neither the intricacies of *Hoffman* nor its potential impact upon this litigation require exploration: because the argument was not made to the district court or in appellant's opening brief, surfacing only in his reply brief, it has been waived. *See Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (arguments not made below cannot ordinarily be raised for the first time on appeal); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979) (same); *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir.1983) (appellant cannot instate omitted point "merely by referring to it in a reply brief or at oral argument"); *United States v. Weber*, 668 F.2d 552, 561 (1st Cir.1981) (same), *cert. denied*, 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1313 (1982).

## B.

 Even if we assume, contrary to the record, that there was some intimation in the course of *Sandstrom I* that Chem-Lawn would not contest personal jurisdiction in Maine, any such commitment would be irrelevant to the situation in *Sandstrom II*. Absent explicit conditions to the contrary—and there were none here—a voluntary dismissal under Fed.R.Civ.P. 41(a) wipes the slate clean, making any future lawsuit based on the same claim an entirely new lawsuit unrelated to the earlier (dismissed) action. *See Hill v. W. Bruns & Co.*, 498 F.2d 565, 567 n. 2 (2d Cir.1974); *Bomer v. Ribicoff*, 304 F.2d 427, 428 (6th Cir.1962); *Bryan v. Smith*, 174 F.2d 212, 214 (7th Cir.1949); *see also* 9 C. Wright & A. Miller, Federal Practice and Procedure:

Civil § 2367 at 186 (1971). Agreements do not automatically survive from one suit to the next.

In this regard, we find persuasive the reasoning in *In re Piper Aircraft Distribution System Antitrust Litigation*, 551 F.2d 213 (8th Cir.1977). There, plaintiff Van–S Aviation, a former dealer, had initiated civil antitrust litigation against Piper Aircraft Corporation and various Piper distributors in seven different judicial districts. Van–S sought to represent all victimized Piper dealers. *Id.* at 215–16. In May 1974, a federal district judge in the Southern District of Florida resolved the class action issue against the plaintiff. The following day, plaintiff filed a notice of voluntary dismissal, Fed.R.Civ.P. 41(a)(1)(i), in the Florida case. Later, the six remaining suits were consolidated for pretrial proceedings in the Western District of Missouri. The Missouri district court refused to consider granting class action status, ruling that the Florida decision conclusively resolved the class certification issue. *Piper*, 551 F.2d at 216. The Eighth Circuit reversed, stating: "The effect of a voluntary dismissal without prejudice is to render the [dismissed] proceedings a nullity and leave the parties as if the action had never been brought." *Id.* at 219. The voluntary dismissal of plaintiff's Florida action, therefore, "carrie[d] down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect of plaintiff's claim." *Id.* (quoting 27 C.J.S., *Dismissal and Nonsuit*, § 39 (1959)). Our own precedent corroborates the same rule. *See Cambrera v. Municipality of Bayamon*, 622 F.2d 4, 6 (1st Cir.1980).

*Sandstrom I* ended in a prototypical, garden variety voluntary dismissal. Absent explicit conditions to the contrary, the prior proceedings became a nullity. We agree with the *Piper* and *Cambrera* panels that, once an action has been voluntarily discontinued, all markings are erased and the page is once again pristine.[4] It follows

---

4. To be sure, we have held voluntary dismissal not to preclude a court from imposing sanctions

for conduct which occurred prior to dismissal. *See Muthig v. Brant Point Nantucket, Inc.*, 838

inexorably that, in filing *Sandstrom II*, plaintiff could not exhume any alleged jurisdictional consent in *Sandstrom I* for the purpose of establishing jurisdiction in *Sandstrom II*. The two cases were separate and independent, and had to be treated in that manner.

■ Nor do we sense any gross inequity arising out of the evenhanded application of this settled rule. Plaintiff—who planned all along to refile his action—could have sought to condition voluntary dismissal on an agreement that ChemLawn would not subsequently contest the jurisdiction of Maine's courts. He did not do so. Absent an agreement, plaintiff could have asked the district court to impose a specific condition to that effect, *see* Fed.R.Civ.P. 41(a)(2). He did not do so. Or, plaintiff could have proceeded to trial on the assigned date rather than attempting to accommodate his counsel's convenience.[5] Having eschewed these avenues, plaintiff's invocation of equitable principles rings hollow. Equity, after all, ministers to the vigilant, not to those who slumber upon their rights.

### C.

Plaintiff makes two additional arguments, claiming that (1) principles of "judicial estoppel," *see, e.g., Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 211–15 (1st Cir.1987) (discussing concept), barred ChemLawn from contesting personal jurisdiction in *Sandstrom II*, and (2) ChemLawn's jurisdictional challenge amounted to "fraud on the court," *see Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118–19 (1st Cir.1989) (discussing concept). We consider these closely related sorties in the ensemble.

■ As a threshold matter, we note that this double-barrelled jeremiad—which was coherently pulled together for the first time in Sandstrom's reply brief in this court—is procedurally defaulted. *See supra* p. 86 and cases cited. We reaffirm the rule that in the absence of exceptional circumstances, *see, e.g., United States v. LaGuardia*, 902 F.2d 1010, 1013 (1st Cir. 1990) (discussing criteria for exception), arguments which could have been timely raised, but were not, will be rejected. If counsel are routinely allowed to approach the district court with studied nonchalance and are excused from doing their homework until the case is on appeal, scarce judicial resources will be squandered. Moreover, such casualness ultimately deprives an appellate tribunal of both a properly developed record and the district judge's insights into the point. When, as here, the argument is not seasonably presented on appeal, the difficulties we have just enumerated are compounded: the appellee is given no fair chance to respond to a theory which emerges for the first time in the appellant's reply brief and the court of appeals is left with but one side of a two-sided story.

We could, of course, stop at this juncture. Yet, because the plaintiff's allegations contain accusations of impropriety and impugn defense counsel's integrity, we believe it is fitting to announce an alternate holding and summarize why we deem these charges to be not only untimely but unfounded.

■ As we have explained, judicial estoppel "should be employed when a litigant is 'playing fast and loose with the courts' and when 'intentional self-contradiction is

---

F.2d 600, 603–04 (1st Cir.1988); *but see Johnson Chemical Co. v. Home Care Products, Inc.*, 823 F.2d 28, 31 (2d Cir.1987). *Muthig*, however, is a horse of a different hue. There, the appeal was decided on jurisdictional grounds: we ruled that a judge, faced with the commission of sanctionable conduct, did not "lose[ ] jurisdiction [to impose sanctions] automatically upon the filing of a voluntary dismissal." 838 F.2d at 603. As a matter of judicial administration, it would be anomalous to allow litigants to "escape a sanction by, say, voluntarily dismissing a case just before committing a contempt." *Id.* at 603–04.

*Muthig* speaks to the court's power over a single case, not to the rights of litigants *inter sese* in two distinct cases. In sum, *Muthig* does not imply that successive lawsuits, bracketed around a Rule 41(a) voluntary dismissal, should be viewed as a seamless web.

5. The record leaves no serious question but that *Sandstrom I* was, or would have been, trial-ready but for the involvement of plaintiff's lead counsel in protracted litigation before a Maryland state court.

being used as a means of obtaining unfair advantage'." *Patriot Cinemas*, 834 F.2d at 212 (quoting *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir.1953)); *see also United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.) (observing that the "primary concern of the doctrine of judicial estoppel is to protect the integrity of the judicial process"), *cert. denied*, 488 U.S. 894, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988). By the same token, a fraud on the court requires that a litigant and his lawyer concoct some unconscionable scheme calculated to impair the court's ability fairly and impartially to adjudicate a dispute. *See Aoude*, 892 F.2d at 1118.

■ This case has none of the requisite hallmarks. ChemLawn did not benefit at all from the transfer of *Sandstrom I* to Maine rather than Connecticut; the choice of a Maine situs benefited plaintiff. Similarly, ChemLawn did not induce the plaintiff to discontinue *Sandstrom I;* that was the plaintiff's idea, implemented for the plaintiff's sake, to accommodate his attorney. There is no sign that defendant played "fast and loose;" it was at the worst guilty of a sin of syntax, using an awkward locution in its moving papers in *Sandstrom I.* The plaintiff's strident attempt to bend these facts to fit palustrine theories grounded in misconduct constitutes an unfortunate elevation of rhetoric over reason. We can see no basis for the claim that appellee intentionally led appellant down the garden path.

## III. GENERAL PERSONAL JURISDICTION

■ The determination that *Sandstrom I* fails to furnish a rake large enough to drag ChemLawn before a Maine court does not end our inquiry. Plaintiff contends that, even apart from the spillover effect of the prior proceedings, the court had *in personam* jurisdiction over the defendant in *Sandstrom II.* The district judge disagreed. So do we.

Maine's long-arm statute permits the assertion of personal jurisdiction over nonresidents "to the fullest extent permitted by the due process clause of the United States Constitution, 14th Amendment." 14 M.R.S.A. § 704–A (1964). Thus, the first step in factoring the jurisdictional calculus requires determining whether concepts of general or specific jurisdiction apply. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8–9, 104 S.Ct. 1868, 1872 n. 8–9, 80 L.Ed.2d 404 (1984); *Donatelli v. National Hockey League*, 893 F.2d 459, 462–63 (1st Cir.1990). In this case, it is perfectly plain that the former classification pertains. The suit cannot be said to stem from any activities carried on by defendant in Maine. The interdicted conduct and the harm both occurred in Connecticut. Because the cause of action in no way arises out of, or bears a direct relation to, ChemLawn's contacts with the forum state, specific jurisdiction is lacking. *See Helicopteros*, 466 U.S. at 414 n. 9, 104 S.Ct. at 1872 n. 9; *Donatelli*, 893 F.2d at 463.

The outcome of a search for general jurisdiction depends largely on whether a corporate party carried on "continuous and systematic" activities within the forum sufficient to justify requiring it to answer there to a claim unrelated to its in-forum presence. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445, 72 S.Ct. 413, 418, 96 L.Ed. 485 (1952). The crux of the matter, as the *Perkins* Court stated, is case-specific:

> The amount and kind of activities which must be carried on by the foreign corporation in the state of the forum so as to make it reasonable and just to subject the corporation to the jurisdiction of that state are to be determined in each case.

*Id.* A bifurcated investigation must be undertaken:

> [T]he judicial inquiry into general jurisdiction has two stages. A reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance, that is, if the constitutionally necessary first-tier minimum is lacking, the inquiry ends. If, however, the minimum exists, the criteria catalogued by the Court must be assessed in order to determine the constitutionality, in the particular circumstanc-

es, of an exercise of jurisdiction. At that stage, the criteria may work either to shrink the minimum contacts threshold (thus facilitating the assertion of general jurisdiction) or to defeat general jurisdiction entirely. In other words, the criteria (or "Gestalt factors," one might say) are secondary rather than primary; unless the defendant has some cognizable contacts with the proposed forum, the court cannot assert general jurisdiction.

*Donatelli*, 893 F.2d at 465 (citations omitted). In this instance, we need not move past the first tier.

On appeal, plaintiff enumerates three groups of contacts which he claims sustain jurisdiction: licensure and appointment of an agent for service of process; advertising; and litigation activities. The discernible facts are as follows. Although ChemLawn never did business in Maine, it secured a license and appointed an agent for service of process under 13–A M.R.S.A. § 1212(6) (1964), clearing the decks to transact business in the future should it wish to do so.[6] The advertising in question consisted not of product or service-availability advertising but of personnel recruitment: ChemLawn occasionally placed "help wanted" ads in a Maine newspaper seeking manpower for its New Hampshire operation. Insofar as we can tell from the rather scanty record, the "litigation activities" related exclusively to ChemLawn's involvement in *Sandstrom I.*

In *Glater v. Eli Lilly & Co.*, 744 F.2d 213 (1st Cir.1984), the defendant corporation not only advertised its wares within the forum state (New Hampshire), but also employed eight sales representatives within the state, three of whom were residents. *Id.* at 215. Although the defendant did business within New Hampshire, we nonetheless held that its contacts were too fragmentary to satisfy the constitutional standard for the exercise of general jurisdiction.

To much the same effect is *Seymour v. Parke, Davis & Co.*, 423 F.2d 584 (1st Cir.1970). In that situation, the defendant employed several salesmen who transacted business in the forum state, disseminating product information and taking orders. *Id.* at 585. Defendant also advertised in the forum by mail and otherwise. *Id.* Still, we ruled that the Constitution would not permit a state to assume general jurisdiction in such circumstances. *Id.* at 587; *see also Helicopteros*, 466 U.S. at 417–18, 104 S.Ct. at 1873–74 (regular course of purchases within state not enough to warrant assertion of general personal jurisdiction); *Dalmau Rodriguez v. Hughes Aircraft Co.*, 781 F.2d 9, 14–15 (1st Cir.1986) (submission of bid and trips into forum by defendant's employees to render technical assistance and make sales call "too attenuated" to ground personal jurisdiction); *cf. American Express Int'l, Inc. v. Mendez–Capellan*, 889 F.2d 1175, 1179–81 (1st Cir.1989) (maintenance of bank accounts in forum, payment of bills from those accounts, and sending of employees into forum for training sessions not enough to permit exercise of personal jurisdiction).

ChemLawn's contacts with Maine are far more exiguous than the contacts which we found inadequate in *Glater* and *Seymour*. Though licensed to do business in Maine, appellee has never actually done any business there. Appellee has but a single agent in Maine—an agent for service of process, not an agent who conducts business. We agree with the court below that preparations to do business at an indeterminate future date, without more, cannot be confused with actually doing business. Furthermore, there is no basis to suppose that ChemLawn "purposely avail[ed]" itself of the privilege of conducting its affairs in the forum state. *See Kulko v. Superior Court*, 436 U.S. 84, 94, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). Appellee's advertising activities in the forum were neither perva-

---

**6.** In the district court, appellant argued that ChemLawn's licensure and appointment of an agent for service of process constituted a consensual submission to the jurisdiction of Maine's courts. The district court disposed of this assertion convincingly, explicating Maine's unique statutory scheme and the legal meaning of ChemLawn's filings. *See Sandstrom*, 727 F.Supp. at 678–81. Appellant has not resurrected this thesis in his appellate briefs. Hence, we regard the point as conceded.

sive nor even substantial; they fall far short of bridging the jurisdictional gap. Appellee's transfer request in, and ensuing defense of, *Sandstrom I* adds little to the equation. Such involvement is not the type of "continuous and systematic" business activity which the concept of general jurisdiction embraces. *Cf.* 13–A M.R.S.A. § 1201 (1964) ("[m]aintaining, defending or participating in any action or proceeding whether judicial . . . or otherwise" does not constitute doing business).

In the area of general jurisdiction, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1984). Here, no such showing was made. We are fully persuaded that, on the facts of record, Maine could not constitutionally exercise general *in personam* jurisdiction over the defendant.[7]

## IV. SURVEYING THE CROP

We need go no further. *Sandstrom II* could not flower in such arid soil. Because it clearly appears that the district court lacked general personal jurisdiction over ChemLawn, the judge had no principled choice but to dismiss the action on defendant's timely motion.

*Affirmed.*

---

7. The lower court reached the same conclusion without considering plaintiff's evidence of advertising because plaintiff's proffer was substantially out of time. *See Sandstrom,* 727 F.Supp. at 679 n. 6. We think that this approach comported with the court's discretionary powers. *See, e.g., Mendez v. Banco Popular,* 900 F.2d 4,

7 (1st Cir.1990) (court has no obligation to consider untimely submissions in ruling on summary judgment motion) (listing cases). We have concluded, however, that it makes no difference in the final analysis whether the "advertising evidence" is considered. Either way, no general *in personam* jurisdiction inheres.